UNITED STATES *v.* T. E. ASH (AMERICAN ASKANIA CORP.), FREEDMAN & SLATER (NO. 3906)[1]

[1] T. D. 48211.

United States Court of Customs and Patent Appeals, March 2, 1936

*Joseph R. Jackson*, Assistant Attorney General (*John F. Kavanagh*, special attorney, of counsel), for the United States.

*Ira P. Jones, Jr.*, for appellees.

[Oral argument December 3, 1935, by Mr. Kavanagh and Mr. Jones]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court in reappraisements 90752–A, etc.

This cause was before us in *United States* v. *T. E. Ash*, 22 C. C. P. A. (Customs) 395, T. D. 47401. We quote from our former decision:

This is a reappraisement proceeding in which the Government has appealed from a judgment of the First Division of the United States Customs Court holding cost of production as respectively defined in sections 402 (e), Tariff Act of 1922, and 402 (f), Tariff Act of 1930, to be the proper dutiable value of the merchandise and that such value had been shown by the record in the case.

The merchandise consists of what are called "torsion balances" and "magnetic field balances," and accessories for each, which are used on the surface of the ground for locating the position and probable depth of mineral deposits (especially oil) below the surface.

Forty-three entries are involved, of which 42 were made under the Tariff Act of 1922 and one (for a relatively minor part) under the Tariff Act of 1930. Forty-one of the entries were made at the port of Houston, Tex., and two at the port

of New York. For the purposes of trial and determination, all appeals were consolidated in a single case.

\*         \*         \*         \*         \*         \*         \*

The important factor is that certain evidence, admissible under the provisions of the respective statutes, was presented showing the issuance by the manufacturer in Germany of catalogues and price lists offering such merchandise for sale in Germany, during the period when the exportations here involved were made, and no evidence has been presented to negative the *fact* of such offers, nor has any effort been made to show that these were not free offers open to any and all purchasers in whatever quantity or quantities—whether 1 device or 100 devices, or more—that such purchaser or purchasers might have desired.

We are thus confronted with a situation wherein both the trial court and the appellate division made negative findings as to the existence of foreign value without even having referred in their decisions to the evidence relating to *offers of sale* in Germany. We have no means of determining whether those tribunals considered the evidence upon that point and rejected it as not being true, or for some other reason or reasons, or whether they held simply as a *matter of law*, that, even if accepted as proving a fact, the said fact of offers of sale made in the manner so shown, did not establish foreign value within the purview of the respective statutes.

In its decision upon which the judgment herein appealed from was based, the Appellate Division of the Customs Court held that the offers of sale referred to in the opinion of this court, *supra*, were not offers of sale in the principal markets of the country of exportation in the usual wholesale quantities and in the ordinary course of trade, within the purview of sections 402 (b) of the Tariff Act of 1922, and 402 (c) of the Tariff Act of 1930; that the imported merchandise had no foreign, export, or United States values, as defined in those acts; that its dutiable value was the cost of production, as defined in sections 402 (e) of the Tariff Act of 1922, and 402 (f) of the Tariff Act of 1930; and that the cost of production, as shown by the record, was the invoice values of the merchandise as claimed by the importers.

It is contended by counsel for the Government that it affirmatively appears of record the involved merchandise had foreign values on the dates of its exportation, but that if there is substantial evidence of record to support the decision of the Appellate Division of the Customs Court that there were no such values, the court, nevertheless, erred in holding cost of production had been established in conformity with sections 402 (e) and 402 (f), *supra*. The Government does not contend that subsections (e) and (f) of sections 402, *supra*, have not been complied with in part. It does contend, however, that the importers have failed to establish the proper addition for profit provided for in paragraph 4 of those subsections.

The provisions of the paragraphs in question being identical, we deem it necessary to quote only paragraph 4, section 402 (f), Tariff Act of 1930. It reads:

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which

ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

As was stated in the quoted excerpt from our former opinion, the instruments here involved are "torsion balances," "magnetic field balances," and accessories therefor, and "are used on the surface of the ground for locating the position and probable depth of mineral deposits (especially oil) below the surface."

In an affidavit, Exhibit 3, signed by seven officials and employees of the German manufacturer (Askania Werke) it appears that the—

* * * torsion balances * * * determine the direction and distribution of the force of gravity. The field balances determine the distribution and direction of the vertical or horizontal intensity of the earth magnetism. Their object is to allow the geologists and geophysicists, through these mathematical, physical results, to obtain certain ideas about the structure, dipping, extent and depth of the nonvisible strata of the underground on the surface. As a result of these measurements and knowledge gained by them, the geologists and geophysicists determine such places in an area where a boring has to be made in order to obtain definite information about the whole surveyed territory, through one or a few borings systematically selected. By this method, in all countries where trained geophysicists have been working with torsion balances, or magnetic field balances, new deposits have been discovered. For instance, petroleum, salt domes, potash, or coal deposits.

There is substantial evidence of record to establish that, due to their highly scientific and technical character, it was necessary that the mechanism and the method of handling and using the involved instruments be explained by experts to the users, and, for that reason, the manufacturer refused to sell them to dealers for resale, but restricted its sales to ultimate consumers; that the exporter was the only manufacturer in Germany of instruments like those here involved; that no instruments "similar" thereto, in a tariff sense, were produced in Germany; that such parts and accessories as were purchased by the manufacturer for use in the construction of the involved and like merchandise were made for its exclusive use in accordance with its special specifications, and were neither sold nor offered for sale to any other manufacturer or consumer in Germany.

Relative to sales of the involved and like instruments, the "Assistant Customs Attaché, Acting in Charge," reported (Exhibit 2) as follows:

* * * Of about 200 magnetic field balances produced in a year the great majority go to the United States, about a fourth as many to the rest of the world, while only five or six are sold in Germany and these singly to scientific or educational institutions as a rule.

In Germany only a few oil wells exist and the districts have long ago been thoroughly explored geologically, etc., so that there is no demand or market in Germany for the field balances (and torsion balances) for the use of oil producers or exploration.

Instruments of this kind are so seldom called for or sold in Germany and then singly to individual puchasers [purchasers]—and as to each one sold experts of the company must devote a good deal of time in explaining how to use and care for the instruments, as they are extremely scientific and delicate—it is impracticable for the company to place them through the ordinary market channels through wholesale dealers in optical or other ordinary well understood scientific instruments.

They are not handled in a wholesale way through wholesale dealers with a customary discount of possibly 40 to 50% to such dealers. The small demand and the nature of the articles require that they should be sold for home consumption in Germany directly to the ultimate users.

We must hold that there is substantial evidence of record to support the decision of the Appellate Division of the Customs Court that neither instruments like those here involved, nor others "similar" thereto, were sold or freely offered for sale in the principal markets of Germany *to all purchasers* (sales being restricted to one class of purchasers—the individual consumer) in wholesale quantities in the ordinary course of trade, either for consumption in Germany or for export to countries other than the United States, and that, therefore, they had no foreign values.

It is conceded that the merchandise had no export values, its sales for export to the United States being limited to the importer—American Askania Corporation, which is owned and controlled by the German manufacturer—Askania Werke.

It is the contention of counsel for the Government that appellees failed to establish cost of production, because, it is said, the evidence establishes that an arbitrary sum of 15 per centum was added for profit to the actual cost of materials, the fabrication thereof, etc.; that they should have included profits made from sales in Germany, but did not do so; that they also failed to include therein prospective profits of the American Askania Corporation in the United States, which, it is argued, should have been included because the latter company is owned and controlled by the German manufacturer.

We are of opinion that the prospective profits, if any, of the importer, American Askania Corporation, have nothing whatsoever to do with the "profit" ordinarily added by manufacturers in the country of exportation of merchandise of the same general character as that here involved, as provided in paragraphs 4 of sections 402 (e) and 402 (f), *supra*. See *United States* v. *American Aniline Products, Inc.*, 22 C. C. P. A. (Customs) 380, 385, T. D. 47399.

In its decision of November 15, 1933, Circular 3250, which is expressly made a part of its involved decision, the Appellate Division of the Customs Court, among other things, said:

* * * It is claimed that this profit was arbitrarily arrived at by the manufacturer; that it is not the profit which is ordinarily added in the case of merchandise of the same general character.

We quote from the affidavit [appellees' Exhibit 3]:

The amount added by us for profit, over and above all other charges and cost elements, is 15%. We have every reason to believe, from general knowledge of manufacturing and trade practices, that the profit which we have added is approximately the same as would ordinarily be added by manufacturers or producers in Germany, engaged in manufacturing merchandise of the same class or kind. We are quite satisfied with such rate of profit, and believe it to be reasonable and just from every consideration.

The manufacturer is thus giving his reasons for adding 15 per centum.

It is clear, we think, from what has been said, that the Appellate Division of the Customs Court was of opinion that merchandise of the same general character as that here involved, but not "similar" thereto, within the purview of sections 402 (b) and (c), Tariff Act of 1922, and 402 (c) and (d), Tariff Act of 1930, was produced in Germany, and that the 15 per centum "profit," added by the importers in the case at bar, was "equal to the profit" ordinarily added by manufacturers in Germany of merchandise of the same general character as that here under consideration. That there is substantial evidence to sustain such a holding by the court, is evidenced by the excerpt from Exhibit 3, included in the court's opinion hereinbefore quoted. See *United States* v. *Henry Maier*, 21 C. C. P. A. (Customs) 41, 50, 51, T. D. 46378.

For the reasons stated, the judgment is *affirmed*.

LENROOT, Judge, dissents.